United States District Court
District of Connecticut
FILED AT          BRIDGEPORT
3/29/04
Kevin F. Rowe, Clerk
By D. Cindee
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| FRANKIE DELISE, <br> Petitioner | CASE NUMBER <br> 3:03 CV 382 (JCH)(HBF) |
| v. |  |
| KUMA DEBOO and HARLEY G. LAPPIN, <br> Respondents. | MARCH 15, 2004 |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS

**I.     INTRODUCTION**

Petitioner Frankie Delise, currently incarcerated at the Federal Correctional Institute in Danbury, Connecticut ("FCI Danbury"), brings this petition to request that this Court grant a Writ of Habeas Corpus, pursuant to 28 U.S.C. §2241, and issue an injunction requiring Respondents to provide Petitioner with necessary medical treatment for Hepatitis C.

**II.    JURISDICTION**

1.     This action arises under 28 U.S.C. §2241; jurisdiction is thus conferred upon this Court by 28 U.S.C. §1331.

### III. <u>VENUE</u>

2.     Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §§1391 (b)(2) and 2241 <u>et</u>. <u>seq</u>. Petitioner is presently and has been in custody at FCI Danbury during the events in question.

### IV. <u>PARTIES</u>

3.     Petitioner Frankie Delise (Reg. No. 40043-037) is a federal prisoner in the custody of the Federal Bureau of Prisons ("BOP"). She is currently incarcerated at FCI Danbury.

4.     Respondent Kuma DeBoo is and has been the Warden at FCI Danbury at all relevant times. As Warden, she is responsible for providing a safe and secure facility for the inmates, has ultimate supervisory responsibility for the staff at FCI Danbury, and has an affirmative duty to ensure that inmates receive proper medical care.

5.     Respondent Harley G. Lappin is the Director of the Federal Bureau of Prisons [BOP]. As Director, he is responsible for providing a safe and secure facility for inmates, has ultimate supervisory responsibility for all Federal prisons, including FCI Danbury, and has an affirmative duty to ensure that all inmates committed to the custody of the BOP receive proper medical care.

2

## V.     FACTUAL ALLEGATIONS

6.    Petitioner Frankie Delise was born on or about June 15, 1954 and is now 49 years old.

7.    Petitioner Delise is committed to the custody of the BOP, having been sentenced in the United States District Court for the Eastern District of Virginia, after pleading guilty to a violation of 21 U.S.C. § 846 and 18 U.S.C. § 2, to a term of 300 months in prison. Petitioner's projected statutory release date is in or about September 2020.

8.    Initially, Petitioner was designated to FCI Tallahassee in Florida. In October 2000, Petitioner was transferred to a state prison facility, Fluvanna Correctional Center for Women in Virginia, and, in November 2001, Petitioner was transferred to FCI Danbury in Connecticut where she has remained to the present time.

9.    In or about January 2001, after Petitioner was transferred to Fluvanna, it was discovered that she had the Hepatitis C virus [HCV], a potentially life threatening illness that may lead to progressive fibrosis of the liver, cirrhosis and liver cancer. Petitioner was not aware of nor was she informed of her condition at that time.

10.    In or about April 2001, Petitioner learned for the first time that she had HCV when a nurse inadvertently revealed her HCV status to her.

3

11. The liver function and viral load tests that were done on Petitioner shortly thereafter were abnormal. Follow up testing that was done in June 2001 continued to show abnormal results.

12. A teleconference was held in August 2001 with a medical specialist who recommended that Petitioner's HCV be genotyped and that she be considered an appropriate candidate for antiviral drug therapy.

13. Despite the specialist's recommendations, Petitioner was refused treatment at Fluvanna. Petitioner immediately began a letter writing campaign addressed, *inter alia*, to the central health services office of the BOP in Washington, D.C. seeking to be transferred back to a Federal institution so that she could receive the medical care she needed.

14. In November 2001, Petitioner was transferred by the BOP to FCI Danbury

15. After she arrived at FCI Danbury, Petitioner immediately began seeking treatment for her HCV. In this regard, Petitioner repeatedly went to sick call to ask why she was not getting her periodic three month blood work and when she would have a diagnostic liver biopsy and her HCV would be genotyped.

16. Despite Petitioner's repeated requests for treatment of her HCV, nothing was done until May and June 2002, when the liver biopsy and genotyping were finally done.

4

17. In June 2002, Petitioner was informed that she was diagnosed with chronic Hepatitis C – Grade 3/Stage 3 – as a result of the liver biopsy and that the genotype was 1b.

18. The medical staff at Danbury did not inform Petitioner concerning the seriousness of her diagnosis. Petitioner sought information on her own about the significance of her Grade 3/Stage 3 diagnosis and learned that her HCV had progressed so far that she was just 1 stage short of being diagnosed with cirrhosis.

19. In June or July 2002, after the biopsy results were known and the genotyping had been done, Petitioner was informed that the medical staff at FCI Danbury would request permission from the central health services office of the BOP in Washington, D.C. to give Petitioner antiviral drug therapy.

20. Petitioner was not started immediately on treatment so she kept asking the medical staff whether Washington had responded to the request for treatment. On one occasion, a staff doctor at FCI Danbury told her that if it were up to him, he wouldn't treat her at all because her chances were slim to none.

21. Finally, in October 2002 the request for treatment was approved and Petitioner begin receiving combination antiviral drug therapy with pegylated interferon/ribavirin.

22. Soon after treatment began, Petitioner discovered, by reading the directions on the

5

box of pegylated interferon, that she was being given the wrong dosage of the medication in that the does was too low for her body weight.

23. Petitioner pointed the mistake out to the medical staff at FCI Danbury but the staff did not acknowledge their mistake or correct the dosage of the medication given to Petitioner for three and a half months.

24. When the treatment was beginning in or about the end of September 2002, Petitioner immediately filed an internal administrative remedy request complaining about the BOP's then existing treatment protocol for HCV which set a 24 week limit on the course of treatment unless viral load testing at 24 weeks showed a "2 log decrease" in viral levels from pretreatment levels. Petitioner objected to the this limitation on treatment both because a 24 week limitation on treatment was contrary to the standard of practice for her condition and because, in any case, the pretreatment testing that was done on Petitioner made it impossible to determine whether she met the protocol for extending treatment.

25. The pretreatment test of Petitioner's viral level that FCI Danbury obtained did not provide the information necessary to ascertain whether there was a "2 log decrease" in Petitioner's viral level because the test only measured viral levels between 600,000 and 850,000 IU/ml and Petitioner's viral level was, in fact, greater than 850,000 IU/ml and, therefore, not

measured.

26. With the exception of the teleconference consultation that was obtained in August 2001 while Petitioner was incarcerated in a state prison at Fluvanna, the BOP has not obtained a consultation with an HCV specialist concerning Petitioner's condition and recommended treatment. The medical staff at FCI Danbury did not and does not have the expertise required to diagnose and/or establish an appropriate treatment plan for Petitioner's HCV.

27. Because she was concerned about her health, Petitioner located and wrote to an HCV expert, Dr. Bennet Cecil, a physician board certified in Internal Medicine and Gastroenterology/Heptology who is the Medical Director of the Hepatitis C Treatment Centers in Louisville, Kentucky, in order to obtain information concerning her condition and recommended treatment.

28. Dr. Cecil informed Petitioner that she was being incorrectly dosed and that she required at least 48 weeks of antiviral drug therapy.

29. Even though Petitioner informed the medical staff at FCI Danbury that the directions on the box of the medication indicated that she was receiving an incorrect dosage of pegylated interferon and filed a request for an administrative remedy bringing this information to higher authorities within the BOP, Petitioner's request for administrative remedy was denied and

7

FCI Danbury continued to give Petitioner an incorrect dose of her antiviral medication for three and a half months.

30. In January 2003, as soon as Petitioner received notice that BOP had finally denied her request for an administrative remedy, Petitioner prepared the instant habeas petition. The docket reflects that the petition was filed on March 3, 2003 in the United States District Court for the District of Connecticut.

31. After three and a half months of giving Petitioner an incorrect dosage of her medication, medical staff at FCI finally acknowledged their mistake and began giving Petitioner the correct dose.

32. Petitioner filed her habeas petition because she was informed that BOP would not continue her treatment after 24 weeks unless her viral level was undetectable at 24 weeks and the pretreatment testing she had received made it impossible to measure the reduction in viral levels she experienced as a result of treatment and, therefore, made it impossible for her qualify, under BOP's existing treatment protocol, for the full 48 weeks of antiviral therapy unless her viral levels were undetectable after 24 weeks.

33. BOP's treatment put petitioner at substantial risk of not receiving appropriate medical care for the life threatening condition she had inasmuch as the standard of medical care

8

for treatment of HCV, genotype 1b, Stage3/Grade 3 required that she receive 48 weeks of antiviral therapy to clear the virus.

34. Despite the fact that Petitioner had received too low a dosage of the pegylated interferon for three and a half months, BOP refused to defer the 24 week testing.

35. When the 24 week testing was done in or about May 2003, Petitioner's viral levels were "undetectable" and, as a result, she qualified under BOP protocol for the 48 week course of treatment. The 48 week course of antiviral therapy concluded in October 2003.

36. The standard of medical care for treatment of patients with Petitioner's diagnosis, test results and course of treatment requires repeat viral load testing 6 months and 1 year after the 48 week course of antiviral therapy has concluded. Petitioner must, therefore, be retested in April and October 2004. Only if her viral levels continue to be undetectable will she be considered "cured."

37. If on retesting, Petitioner has detectable viral levels, the standard of medical care requires that she be given another course of antiviral therapy.

38. However, when Petitioner asked whether she would be retreated if her viral levels became detectable on the 6 month or 1 year retesting, she was informed by medical staff at FCI Danbury that they would "cross that bridge when they came to it."

9

39. Respondents continue to thwart Petitioner's efforts to obtain appropriate medical treatment. For example, medical staff does not schedule Petitioner for the periodic blood tests she is required to have; rather, Petitioner has been required to write a "cop-out" each time she is due to have a blood test so that she will be put on the list for blood-testing.

40. After arriving at FCI Danbury, Petitioner requested Respondents to obtain a consultation from a medical specialist concerning her HCV diagnosis and treatment but, to date, none has been obtained. No consult has been provided even though when Petitioner asked medical staff at FCI Danbury what it means that her AST (liver function) test results continue to be abnormally high, she was told by the staff doctor: "I don't know what it means."

41. In order for Petitioner to receive appropriate medical treatment, it is necessary for a specialist to be consulted concerning her condition, prognosis and treatment plan. Respondents have neglected and/or refused to obtain a consultation from a medical specialist concerning Petitioner's HCV.

## VI. **EXHAUSTION**

42. Petitioner has satisfied the exhaustion provision of the Prison Litigation Reform Act [PLRA]. Furthermore, if Petitioner is required again to exhaust administrative remedies in connection with Respondents' treatment of her HCV, she will be denied necessary and

appropriate medical care and her life, health and safety will immediately be jeopardized.

## VII. CLAIM FOR RELIEF

43. Petitioner's Hepatitis C constitutes a serious medical condition for which she is entitled to reasonable medical care, as guaranteed by the Eighth Amendment to the United States Constitution.

44. Respondents know, knew and/or should have known, that Petitioner's condition of Hepatitis C required and continues to require appropriate medical care.

45. Respondents displayed and/or continue to display deliberate indifference or reckless disregard to that risk by failing to provide her with appropriate treatment for her condition of Hepatitis C.

46. Respondents' failure to provide Petitioner with appropriate and necessary medical treatment violates Petitioner's right, under the Eighth Amendment, to be free from cruel and unusual punishment.

## VIII. PRAYER FOR RELIEF

WHEREFORE, the Petitioner respectfully requests this Court to:

A. Assume jurisdiction over this matter.

B. Issue a writ of habeas corpus and injunctive relief requiring Respondents to

11

provide Petitioner with appropriate and necessary medical treatment.

C. Award Petitioner reasonable costs and attorney's fees; and

D. Grant Petitioner such other and further relief as justice may require.

Dated at Stamford, Connecticut this 15th day of March, 2004.

Respectfully Submitted,
THE PETITIONER,

BY: _____
Kathryn Emmett
Federal Bar No ct05605
Emmett & Glander
45 Franklin Street
Stamford, CT 06901
(203) 324-7744

12

## **CERTIFICATION**

This is to certify that a copy of the foregoing was forwarded, via facsimile and regular mail, postage prepaid, this 15th day of March, 2004, to:

Lauren M. Nash, Assistant U.S. Attorney
P.O. Box 1824
New Haven, CT 06508

_____
Kathryn Emmett

13